IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION, | |
| Plaintiff, | **8:22CV204** |
| vs. | **MEMORANDUM AND ORDER** |
| JBS S.A., et al; | |
| Defendant, | |
| vs. | |
| NEBRASKA BEEF, LTD.; | |
| Movant. | |

A subpoena was served on Movant, Nebraska Beef, Ltd. by Plaintiffs[1] in multi-district litigation currently pending in the United States District Court for the District of Minnesota, referred to as In re Cattle Antitrust Litigation, case numbers 19-CV-1129, 19-CV-1222, 20-CV-1319, and 20CV1414. (Filing No. 11, at CM/ECF p. 2; Filing No. 11-1). Nebraska Beef moved to quash the third-party subpoena, arguing the subpoena seeks irrelevant, privileged, and other protected information, and is unduly burdensome and overbroad. (Filing No. 1).

After the motion to quash was filed, Plaintiffs moved to transfer the motion to quash proceeding to the Minnesota federal court. (Filing No. 10). Nebraska

---

[1] The Antitrust Litigation Plaintiffs (hereafter "Plaintiffs") "refers to Cattle Plaintiffs, Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, Consumer Indirect Purchaser Plaintiffs, Winn-Dixie Stores, Inc., and Bi-Lo Holding, LLC." (Filing No. 11, at CM/ECF p. 2 n. 1).

Beef responded by moving to withdraw the motion to quash. (Filing No. 18).
Plaintiffs oppose the motion to withdraw and seek an order requiring Nebraska
Beef to respond to the subpoena.

For the reasons stated below, the motion to withdraw and the motion to
transfer will be denied. With limited exceptions, the motion to quash will also be
denied, and Nebraska Beef will be ordered to comply with the subpoena.

## FACTUAL BACKGROUND

Plaintiffs have alleged antitrust claims against the Antitrust Litigation
Defendants,[2] alleging that from at least January 1, 2015, through the present, the
Defendants have conspired to fix and suppress the price of fed cattle in the
United States. Defendants are producers of beef and purchasers of cattle in the
United States, and they have collectively purchased and slaughtered over 80% of
the cattle slaughtered in the United States annually. The remaining fed cattle
slaughter capacity is provided by regional Independent Packers such as Movant,
Nebraska Beef, LTD. (Filing No. 34-3, at CM/ECF p. 4). As described by the
multi-district litigation panel:

> [D]efendants sit atop the supply and distribution chain that ultimately
> delivers beef to the market. Their role is to purchase cattle from the
> nation's farmers and ranchers, slaughter, and pack cattle into beef,
> and sell beef to purchasers . . . in the U.S. wholesale market.
> Defendants allegedly implemented and executed their conspiracy
> by, inter alia, coordinating slaughter volumes and cash cattle

---

[2] The Antitrust Litigation Defendants (hereafter "Defendants") are Cargill Meat Solutions
Corporation, Cargill, Inc., JBS Packerland, Inc., JBS S.A., JBS USA Food Company,
National Beef Packing Company, Swift Beef Company, Tyson Foods, Inc., and Tyson
Fresh Meats, Inc. (Filing No. 11-1, at CM/ECF p. 1 n. 2).

purchases to wrongfully drive up the price for beef. Plaintiffs allege that this conduct violated federal antitrust law.

(Filing No. 11-1, at CM/ECF pp. 1-2. See also, Filing No. 34-8).

On April 22, 2022, Plaintiffs subpoenaed Nebraska Beef, a third party, to produce records in furtherance of the Minnesota litigation.[3] (Filing No. 1-1).  The subpoena was served on April 26, 2022, (Filing No. 1-1, at CM/ECF p. 68), and commanded Nebraska Beef to produce 11 categories of documents on June 8, 2022. The subpoena begins with six pages of definitions and demands production of documents for the January 1, 2013 through June 30, 2020 time period. A protective order entered by the Minnesota court extends to discovery obtained from third parties, (Filing No. 1-1, at CM/ECF p. 59, ¶ 14), and allows the producing party or third party to designate documents as "confidential" and "highly confidential." The protective order thereby prohibits documents from being made publicly available or used outside of the litigation, or made available to competitors.[4]

Nebraska Beef filed a motion to quash the subpoena on June 7, 2022. (Filing No. 1). It did not file a brief in support of its motion. The motion to quash was served on Plaintiffs' counsel on June 16, 2022. (Filing No. 3; Filing No. 11, at CM/ECF p. 3). Prior to filing its motion to quash, Nebraska Beef did not serve written objections to the subpoena, and it did not contact or attempt to meet and

---

[3] Defendants have apparently served the same subpoena on Nebraska Beef. A motion to quash has not been filed in this forum related to that subpoena. (Filing No. 26, at CM/ECF p. 17).

[4] The protective order is very similar to this court's form protective order, copies of which are posted on the court's website for the parties' convenience.

confer with Plaintiffs' counsel regarding those objections. (Filing No. 11, at CM/ECF p. 3).

Plaintiffs responded to the motion to quash on June 30, 2022, (Filing No. 10-1), and moved to transfer this proceeding to the Minnesota federal court. (Filing No. 10). On July 8, 2022, Plaintiffs' counsel contacted Nebraska Beef's initial counsel, attempting to meet and confer regarding the disputed subpoena. Four days later, new counsel entered an appearance for Nebraska Beef, (Filing No. 12), and requested an extension of time—to August 3, 2022—to respond to the motion to transfer. (Filing No. 13). The motion to continue stated Nebraska Beef's new counsel needed additional time to confer with Nebraska Beef and review the Rule 45 subpoena, the prior filings, and the arguments. The motion stated Nebraska Beef's counsel intended to meet and confer with Plaintiff's counsel and attempt to resolve the dispute over compliance with the subpoena. Nebraska Beef's counsel represented that if the dispute could not be fully resolved, he would then need time to prepare a brief opposing the motion to transfer and supporting its motion to quash. (Filing No. 13, at CM/ECF p. 2).

Plaintiff's counsel contacted Nebraska Beef's counsel on July 15, 2022. During that call Nebraska Beef's counsel represented he would convey his client's position regarding the subpoena in the following week. Nebraska Beef failed to do so. Plaintiff's counsel sent an email to Nebraska Beef's counsel on July 25, 2022, but he received no response. Nebraska Beef had not filed its brief in response to the motion to transfer and in support of the motion to quash on August 3, 2022. (Filing No. 17, at CM/ECF pp. 2-3).

As of August 10, 2022, Nebraska Beef had produced no documents or served any objections in response to the subpoena, and it had neither filed a brief and any evidence in support of its motion to quash, nor responded to

Plaintiff's motion to transfer. As of that date, Nebraska Beef, acting by and through its attorneys, had not substantively conferred with Plaintiff's counsel in an attempt to resolve the subpoena disputes. (Filing No. 17, at CM/ECF p. 3).

Instead, on September 1, 2022, Nebraska Beef moved to withdraw its motion to quash. (Filing No. 18, at CM/ECF p. 1). Plaintiffs opposed that motion because it was concerned that Nebraska Beef would not produce documents without a court order on the motion to quash. (Filing No. 19). The undersigned magistrate judge immediately set a conference call with counsel to prompt some discussion and movement on the pending issues. (Filing No. 26, at CM/ECF p. 4). During that call, Plaintiffs' counsel explained there were two categories of documents at issue: categories requesting transactional documents which Plaintiffs are convinced Nebraska Beef does possess, and categories describing information that Nebraska Beef may possess relating to its ability to compete or participate in the cattle and beef industry. As to the former, Plaintiffs firmly believe Nebraska Beef possesses and must produce the documents; as to the latter, Plaintiffs' counsel asked Nebraska Beef to engage in the process and communicate as to whether the documents exist. (Filing No. 26, at CM/ECF p. 5).

Nebraska Beef's counsel explained that Nebraska Beef believes the requests are overbroad and highly burdensome, particularly since Nebraska Beef is a small operation which uses an archaic system for creating and storing information, and that system is not readily searchable for finding and producing responsive documents. Nebraska Beef also expressed concern that the information requested included confidential business information.

Nebraska Beef's counsel represented "I recognize our need to engage, and we will engage." (Filing No. 26, at CM/ECF p. 11). Counsel endorsed the need for more "meaningful discussions," (Id.), stating he would speak further with

Plaintiffs' Counsel at "a more granular level" to determine what documents could reasonably be retrieved, and to provide more definitive information on what information exists and the burden of producing it. (Filing No. 26, at CM/ECF p. 16). The court afforded Nebraska Beef an additional 30 days to "diligently attempt to figure out how to respond to [the subpoena] and to what extent it can respond to this subpoena" and promptly provide those answers to Plaintiffs' counsel. (Filing No. 26, at CM/ECF p. 17). The court believed the parties could fully resolve the issues if Nebraska Beef would fully explore its own information and capabilities and then communicate with Plaintiff's counsel. (Filing No. 26, at CM/ECF p. 18). The court set an October 7, 2022 hearing to discuss the parties progress, stating:

> Between now and then I expect Nebraska Beef to diligently work toward figuring out what it can and cannot do, convey that information to plaintiffs' counsel, and hopefully get somewhere down the path of getting production started or at the very least be able to define what can and cannot reasonably be produced.

(Filing No. 26, at CM/ECF p. 20).

On September 29, 2022, Nebraska Beef sent a letter to Plaintiffs' counsel which outlined its objections to the subpoena and stated it had no documents responsive to several of the subpoena topics. (Filing No. 27-1). As of the conference call held on October 7, 2022, four months had passed since the date for compliance with the subpoena, and Nebraska Beef had not disclosed any documents, and it had not filed a brief in support of its motion to quash or a brief opposing the motion to transfer. During that call, the court set a 30-day deadline for further briefing on the motion to quash and the motion to transfer. Responsive briefs were due on or before December 9, 2022, with no reply brief allowed.

In support of its motion to quash, Nebraska Beef filed the affidavit of a consultant who has worked with Nebraska Beef for the last three years. The consultant assisted in preparing Nebraska Beef's response to the subpoena. He met 10 times for a total of 10 hours (by phone and in person) with an attorney for Nebraska Beef. He met with Nebraska Beef's current counsel three times for a total of three hours, and with that attorney and a Nebraska Beef employee familiar with our cattle procurement system for approximately one hour. (Filing No. 34-13, at CM/ECF p. 2). He met for two hours with two other executives at Nebraska Beef and with Nebraska Beef's current litigation counsel on October 26, 2022, to again discuss Nebraska Beef's response to the subpoena. (Id).

Following that meeting, the consultant disclosed a Nebraska Beef Organizational Spreadsheet in response to Subpoena Request 1. The consultant states that other than documents publicly available from the Agricultural Marketing Service, Nebraska Beef has no documents responsive to Requests 2 through 5, other than documents publicly available, and it has no documents responsive to Requests 6 and 7. Nebraska Beef's brief and letter to Plaintiffs' counsel states it objects to Requests 8 through 11 as unduly burdensome, irrelevant, and seeking confidential business information.

In the end, Nebraska Beef has produced one document—the Nebraska Beef Organizational Spreadsheet—in response to Plaintiffs' subpoena.

ANALYSIS

Three motions are pending: 1) Nebraska Beef's the motion to quash, 2) Plaintiffs' motion to transfer, and 3) Nebraska Beef's motion to withdraw the motion to quash.

I.     Motion to Withdraw the Motion to Quash

The motion with withdraw the motion to quash will be summarily denied. Plaintiffs have invested substantial time to obtain a court ruling which either orders Nebraska Beef's full or partial compliance with the subpoena, or quashes the subpoena in its entirety. If the motion to quash is withdrawn, that time and work will be wasted, Nebraska Beef will provide no additional documents, and Plaintiffs will have to start the process anew to obtain an order to enforce compliance with a subpoena for additional documents.

II.    Motion to Transfer the Motion to Quash

Plaintiffs asked this court to transfer the motion to quash to the MDL court in Minnesota, arguing "exceptional circumstances" justify the transfer. With the passage of time and the developments in this forum, Plaintiffs now state "the factors supporting transfer of this matter have diminished, and Plaintiffs believe it is appropriate that this Court retain jurisdiction over this matter and rule on the merits of the dispute." (Filing No. 35, at CM/ECF p. 2). Although the motion to transfer now appears to be moot, it remains pending. So, the court will succinctly address it.

Disputes over third-party subpoenas are governed by Rule 45 of the Federal Rules of Civil Procedure. When, as in this case, the court where compliance is required did not issue the subpoena, the motion to quash the subpoena may be transferred to the issuing court "if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45 (f). Nebraska Beef objects to transfer.

Since Nebraska Beef did not consent, the motion cannot be transferred unless exceptional circumstances exist. When deciding if exceptional circumstances exist, the court considers: 1) whether the underlying litigation will be disrupted if the subpoena dispute is not transferred; (2) whether the nonparty subpoena recipient will suffer undue burden or cost if the subpoena dispute is transferred; (3) whether, based on various considerations, the issuing court is in the best position to rule on the motion to compel. In re Syngenta, No. 20-MC-064, 2020 WL 5988498, at *4 (D. Minn. Oct. 9, 2020). As the parties moving for transfer, Plaintiffs bear the burden of proving the motion to quash should be transferred to the Minnesota court. Id.

A. Will the Minnesota litigation be disrupted if transfer is denied?

The motion to quash has been pending in Nebraska, purportedly to pursue a potential amicable resolution between the parties, for six months. This court has conferred extensively with the attorneys regarding the merits, has reviewed all the filings, and is ready to rule on the motion to quash. Transfer at this point would further delay resolution, thereby disrupting the Minnesota litigation rather than limiting that disruption.

B. Will Nebraska Beef incur undue burden or cost if the motion is transferred?

Nebraska Beef claims transferring the motion to quash to Minnesota will cause unnecessary expense, explaining it is a small beef packing operation with less than 2% of the market-share, its sole location is in Omaha, its counsel in Omaha, and any compliance ordered will occur in Omaha. Under the circumstances, both parties will need to re-litigate their issues before the Minnesota court if the case is transferred, resulting in unnecessary costs and fees. The court therefore finds that based on the history of this case, both

9

Plaintiffs and Nebraska Beef will incur unnecessary costs and fees if the motion to quash is transferred.

### C. Is the Minnesota court in a better position to rule on the motion?

While the litigation pending in Minnesota is no doubt complicated, the issues raised in the motion to quash are not. Plaintiffs are requesting only 11 categories of documents, and Nebraska Beef has only one location of operation. This court need not understand all the complexities of the Minnesota lawsuit to rule on the motion to quash. So, as to the motion to quash in this case, the Minnesota court is not in a better position to make the ruling.

Under the facts presented, the court is not convinced exceptional circumstances exist to support transfer of the motion to quash to the Minnesota court. So, in accordance with the parties' current position, the motion to transfer will be denied.

### III.   Motion to Quash

Nebraska Beef moves to quash the subpoena, claiming compliance would be unduly burdensome, the discovery requested is irrelevant, the subpoena requests confidential information, and if the court orders Nebraska Beef to respond, Plaintiffs should bear the cost. (Filing No. 34, at CM/ECF p. 5).

Plaintiffs argue Nebraska Beef failed to comply with Nebraska Civil Rule 45.1(b) prior to filing the motion to quash. They further argue that Nebraska Beef has failed to make any evidentiary showing that compliance is unduly burdensome, will necessitate disclosure of proprietary or confidential information, and that even if such interests are implicated, the protective order already

entered by the Minnesota court would not adequately protect those interests. In other words, Plaintiffs argue the motion to quash should be denied on both procedural and substantive grounds.

The court will discuss each of these arguments; first addressing the procedural issue and then the substantive arguments.

A. Procedural Arguments

Plaintiffs argue Nebraska Beef violated Nebraska Civil Rule 45.1(b) by failing to serve objections and meet and confer with Plaintiffs' counsel prior to filing a motion to quash. (Filing No. 10-1, at CM/ECF p. 13). Under Nebraska Civil Rule 45.1(a), a party may not serve a subpoena for production of documents on a nonparty without first "giving the adverse party notice stating the name and address of the nonparty being subpoenaed, the documents or items to be produced or inspected, the time and place for production or inspection, and the date on which the subpoena will issue." NECivR 45.1(a). The opposing party then has 7 days to serve objections on the noticing party. "No subpoena may be issued for documents . . . under this rule until the parties resolve the objections. Any unresolved objections will be resolved by the court on appropriate motion filed in accordance with Nebraska Civil Rule 7.1." NECivR 45.1(b). Rule 7.1 requires the parties to meet and confer before filing a motion to resolve objections to a proposed subpoena.

Citing Nebraska Civil Rule 45.1, Knapp v. Novartis Consumer Health, Inc., No. 4:14CV3007, 2014 WL 7082089, at *1 (D. Neb. Dec. 12, 2014), and Sampson v. Schenck, No. 8:07CV155, 2013 WL 1914805, at *1 (D. Neb. May 8, 2013), Plaintiffs argue Nebraska Beef's motion to quash must be denied on procedural grounds alone. Plaintiffs are incorrect.

11

As in Knapp and Sampson, Nebraska Civil Rule 45.1 governs the conduct of parties. It does not govern a nonparty's response upon receipt of a subpoena. Nebraska Civil Rule 45.1 provides the mechanism in Nebraska's federal court to resolve any disputes by the parties regarding the scope and propriety of a subpoena before that subpoena is served on a nonparty. While nonparties are wise to serve objections and confer with the serving party before engaging in litigation over compliance with a Rule 45 subpoena, Nebraska Civil Rule 45.1 does not mandate completion of these steps before the nonparty files a motion to quash. Nebraska Beef's motion to quash should not be denied for failure to comply with Nebraska Civil Rule 45.1.

Under Rule 45 of the Federal Rules of Civil Procedure, Nebraska Beef had two options for challenging the subpoena. Under Rule 45(d)(2)(B), "[a] person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection" to comply with the subpoena. Fed.R.Civ.P. 45(d)(2)(B) (emphasis added). "The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Id. If objections are made, the serving party can file a motion to compel. Fed.R.Civ.P. 45(d)(2)(B)(i).

As an alternative, the nonparty may, "[o]n timely motion" file a motion to quash or modify the subpoena. Fed.R.Civ.P. 45(d)(3)(A). If a motion to quash is filed, the nonparty may object to the subpoena by claiming it "(i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed.R.Civ.P. 45(d)(3)(A)(i-iv).

12

In this case, Nebraska Beef did not serve objections within 14 days after being served with the subpoena, and under the express language of Rule 45, it may but did not have to serve objections. Instead, it chose to file a motion to quash. So, the question is whether the motion was "timely."

The 14-day deadline for filing objections to a subpoena is not applicable to a motion to quash a subpoena. Sines v. Kessler, 325 F.R.D. 563, 566 (E.D. La. 2018). While "timely" is not defined in Rule 45(d)(3)(A), nor discussed in the advisory committee notes, "[i]t is well settled that, to be timely, a motion to quash a subpoena must be made prior to the return date of the subpoena." In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.), 581 F. Supp. 3d 509, 516 (S.D.N.Y. 2022) (quoting Estate of Ungar v. Palestinian Auth., 451 F.Supp.2d 607, 610 (S.D.N.Y. 2006). See also, Whiteside v. State Farm Fire & Cas. Co., No. 1:20-CV-01210-JAP-LF, 2021 WL 1390805, at *2 (D.N.M. Apr. 13, 2021); Luman v. FCA US LLC, No. 6:18-CV-06113, 2019 WL 3432422, at *2 (W.D. Ark. July 30, 2019); Sines, 325 F.R.D. at 567 (holding courts have generally interpreted "timely" to mean within the time set in the subpoena for compliance); F.T.C. v. Trudeau, No. 5:12MC35, 2012 WL 5463829, at *3 (N.D. Ohio Nov. 8, 2012).

Here, Nebraska Beef filed it motion to quash on June 7, 2022. The date of compliance stated in the subpoena was June 8, 2022. The motion to quash was filed prior to the noticed date of compliance. It was therefore timely filed, and it will not be denied on procedural grounds.[5]

---

[5] Nebraska Beef argues that "[i]n this case, Nebraska Beef's non-compliance with [Rule 45] should be excused because it is a nonparty with no interest in this case, and the subpoena was overbroad on its face." (Filing No. 34, at CM/ECF p. 17).  Having concluded that Nebraska Beef did not violate Rule 45, I need not address whether any violation should be excused.

B.  Substantive Arguments

Nebraska Beef asserts complying with the subpoena will require disclosure of privileged or other protected matter, (Filing No. 34, at CM/ECF pp. 22-23), and will subject Nebraska Beef to undue burden, (Filing No. 34, at CM/ECF pp. 15. 22).  See also, Fed.R.Civ.P. 45(d)(3)(A)(iii & iv). Nebraska Beef also raises relevancy objections. Since relevancy is a factor when deciding whether requests are unduly burdensome and/or proportional to the needs of the case, the court will address Nebraska Beef's relevancy arguments within the context of evaluating proportionality and burden, and not as a separate objection to Plaintiffs' subpoena.[6]

1)  Standard of Review

Under the Federal Rules of Civil Procedure, a party may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevancy for the purposes of discovery, includes "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). When the discovery sought appears relevant on its face, the person or entity resisting discovery has the burden to establish that the discovery is not relevant, or is "of such marginal relevance that the potential harm occasioned by the discovery would outweigh the ordinary presumption in favor of broad disclosure." Streck, Inc. v. Research & Diagnostic Sys., Inc., 8:06CV458, 2009 WL 1562851, at *3

---

[6] Fed.R.Civ.P. 45(d)(3)(A)(i-iv) lists the objections a third party may raise on a motion to quash. Relevance, as a separate and distinct objection, is not listed.

(D. Neb. June 1, 2009) (quoting Moses v. Halstead, 236 F.R.D. at 671.) However, when the relevance of the discovery request is not readily apparent, the party requesting discovery must first show how the requested information is relevant. CFGenome, LLC v. Streck, Inc., No. 4:16CV3130, 2019 WL 3969178, at *1 (D. Neb. Aug. 22, 2019).

The scope of discovery under a third-party subpoena is the same as the scope of discovery under Rules 26(b) and 34 and is subject to the rules that apply to other methods of discovery. McGehee v. Nebraska Dept. of Corr. Servs., No. 4:18-cv-3092, 2019 WL 266423 (D. Neb., Jan. 17, 2019). However, the standard for nonparty discovery may require a stronger showing of relevance than for party discovery. Cor Clearing, LLC v. Calissio Res. Grp., Inc., No. 8:15CV317, 2016 WL 2997463, at *2 (D. Neb. May 23, 2016).

Unless facially apparent from the request itself, the party or nonparty challenging discovery as unduly burdensome or seeking confidential information must present evidence to support those objections. Arguments in the briefing and conclusory statements in proffered evidence are not enough. Vallejo v. Amgen, Inc., 903 F.3d 733, 743 (8th Cir. 2018). As to burden, the objections must be supported by some evidence regarding the time or expense required for compliance. Id. When claiming documents are confidential business records and therefore not subject to disclosure, objections to production must be supported by evidence describing the type of documents at issue, the measures the business took to maintain the confidential status of the documents, whether the documents are currently available from another source, the extent of company-specific effort in creating the business strategies underlying the documents, and/or how their release will harm the business. Bussing v. COR Clearing, LLC, No. 8:12CV238, 2015 WL 4077993, at *3 (D. Neb. July 6, 2015). As to such evidence, Rule 26 requires a particular and specific demonstration of fact, as

15

distinguished from stereotyped and conclusory statements. Vallejo, 903 F.3d at 743 (citing Gen. Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1212 (8th Cir. 1973)).

2) Objections to the Subpoena

The subpoena lists 11 categories of documents at issue. Nebraska Beef has posed objections to each category and except as to one document in response to Request No. 1, it has disclosed no documents. As to Requests 2 through 7, it states it has no documents to disclose (other than some publicly available records responsive to Requests 2 through 5).

Plaintiffs have proposed an ESI protocol to search computer files for the documents requested. Nebraska Beef also objects to the protocol as unduly burdensome, claiming the listing of search terms is overbroad and that it lacks the IT resources to perform the requested searches. It claims the ESI search would therefore be unduly burdensome and not proportional to the needs of the case. Nebraska Beef claims that if must conduct the ESI search requested, Plaintiffs must pay the costs.

Each of these issues are addressed below, beginning with an analysis of each Request listed in the subpoena.

- REQUEST NO. 1: "Documents sufficient to show Your organizational structure including, but not limited to, any organizational charts."

(Filing No. 1-1 at CM/ECF p. 11).

16

Nebraska Beef argues, "This information is not relevant to the issue of whether the Big Four[7] conspired to fix beef prices." ([Filing No. 34, at CM/ECF p. 24](#)). Plaintiffs have presented no evidence explaining how this information is relevant to the Antitrust Litigation, and the relevancy is not facially apparent. Nonetheless, Nebraska Beef produced the "Nebraska Beef Organizational Spreadsheet." ([Filing No. 34-13, at CM/ECF p. 2](#) ¶ 7).

Nebraska Beef has adequately complied with Request No. 1. The motion to quash this request will be denied as moot.

- REQUEST NO. 2: Documents and Communications[8] discussing or analyzing non-Defendant Meat Packers' ability to: a) compete with the Defendants in the market(s) to purchase Fed Cattle for slaughter in the United States; b) compete with Defendants in the market(s) to sell Beef; and/or c) increase their market share in one or more of the markets addressed in subsections (a) or (b) of this Request.

([Filing No. 1-1 at CM/ECF p. 11](#)).

The crux of Plaintiffs' complaint is that Defendants have conspired to manipulate the markets for profit and to drive down competition. Request No. 2 asks for documents possessed by Nebraska Beef, a non-Defendant meat

---

[7] Nebraska Beef refers to Defendants as the "Big Four" throughout its briefing.

[8] The court notes that "communications," as defined by Plaintiffs' subpoena, includes "every manner or means of disclosure, transfer, or exchange of information (in the form of facts, ideas, inquiries, or otherwise), whether orally, electronically, by document, telecopier, mail, personal delivery, or otherwise." ([Filing No. 1-1, at CM/ECF p. 5](#)). But the subpoena at issue is a documents production subpoena. As such, a request for "communications" must be limited to documented communications and cannot, by definition, include oral communications that were never documented. To the extent Plaintiffs are asking Nebraska Beef to now document any oral communications on the topics described in the subpoena requests and then provide that documentation in response to the subpoena, the request must be denied.

packer, regarding its ability to compete in purchasing cattle for slaughter and selling beef, and its ability to increase its market share. The relevance of the documents requested in Request No. 2 is therefore facially apparent.

Nebraska Beef's brief states it has no documents responsive to Request No. 2. The brief states that "unlike the Big Four, not only does Nebraska Beef not have an analytics department, it also does not employ anyone with an advanced degree in the area of market analytics, nor has it ever contracted with an outside organization to provide the type of analytics referenced by this request." (Filing No. 34, at CM/ECF pp. 24-25). But there is no evidence of record supporting this factual statement within the brief.

Nebraska Beef has offered the affidavit of its outside consultant in support of its motion to quash. The consultant's affidavit states Nebraska Beef has no documents responsive to Request No. 2 other than documents publicly available. But other than vaguely stating he spoke with Nebraska Beef employees, there is nothing in the affidavit explaining how this consultant is qualified to answer the question posed; that is, what has the consultant been hired to do for Nebraska Beef and in that capacity, why would he know if Nebraska Beef has any records within its internal files that are responsive to the request? The court also notes that the consultant has provided services to Nebraska Beef for only three years, far shorter than the span of documents requested by the subpoena.

Other than a conclusory statement that the consultant met with "two other executives at Nebraska Beef" along with its counsel "on 10/26/22 for approximately 2 hours to discuss our response to this subpoena,"[9] there is

---

[9] The date of this meeting is noteworthy. Based on the evidence of record, Nebraska Beef's consultant—who it now relies on to prove it has fully responded to several

nothing of record explaining what efforts Nebraska Beef made to find the documents requested—whether located in file cabinets, saved on a computer, or memorialized in emails or text messages. And the affidavit currently before the court is not signed by an executive of Nebraska Beef and therefore is arguably not a binding response by the company itself.  (Filing No. 34-13, at CM/ECF p. 2).

There is also no evidence that the documents requested are "protected trade secrets, constitute strategic proprietary information, and/or [would] give the receiving party an unfair competitive advantage and insight into a competitor's analysis." (Filing No. 27-1, at CM/ECF p. 2).

Nebraska Beef has failed to meet its burden of proving a substantive response to Request No. 2 would be unduly burdensome or disclose confidential business information. Similarly, it has failed to show the burden and expense of responding is not proportional to the needs of the case. It has also failed to produce admissible evidence that no responsive documents exist. Its motion to quash Request No. 2 will be denied.

- REQUEST NO. 3: Documents and Communications discussing or analyzing the effects of the Tyson Holcomb Plant fire on the U.S. market(s) for fed cattle and/or the U.S. market(s) for Beef.

- REQUEST NO. 4: Documents and Communications discussing or analyzing the decline of U.S. Fed Cattle prices in 2015.

---

subpoena topics—did not meet with any Nebraska Beef executive regarding the subpoena until more than four months after a response was due, and only after this court ordered a response of record to the subpoena.

- REQUEST NO. 5: Documents and Communications discussing or analyzing the supply of Fed Cattle available for slaughter in the United States and/or the U.S. Cattle cycle, including how these matters impact Fed Cattle and/or Beef prices.

- REQUEST NO. 8: Documents and Communications discussing or analyzing a Defendant's: a) U.S. Fed Cattle Procurement practices; b) U.S. Fed cattle slaughter levels; c) U.S. Beef production; d) U.S. Beef sales; e) impact on U.S. Fed cattle prices; and/or e) impact on U.S. Beef process. Including in this request are Documents and Communications discussing or analyzing a Defendants' use of any weekly purchase or "trading windows" . . . for Fed Cattle transactions, and/or any permanent or temporary boycott of Fed Cattle Producers or feedlots in the United States by any Defendant, including regional boycotts.

([Filing No. 1-1, at CM/ECF pp. 11-13](#)).

As to Request No. 3, Plaintiffs Amended Complaint alleges "Defendants' margins skyrocket[ed] in the aftermath of the Holcomb plant fire." ([Filing No. 34-8, at CM/ECF pp. 41-42](#) ¶ 126). See also, [Filing No. 34-8, at CM/ECF pp. 158-59](#), ¶¶166-169). The discovery described in Request No. 3, which seeks documents discussing or analyzing the effects of the Tyson Holcomb Plant fire on the U.S. fed cattle and beef markets, is relevant.

As to Request No. 4, Plaintiffs' Amended Complaint alleges "Tyson Fresh, Swift/Packerland, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These artificial reductions worked to cause the dramatic decline in fed cattle prices starting in 2015 and continuing throughout the Conspiracy Period." [Filing No. 34-8, at CM/ECF pp. 43-44](#), ¶128). The discovery described in Request No.

4, which seeks documents discussing decline of U.S. Fed Cattle prices in 2015, is relevant.

As to Request No. 5, Plaintiffs' Amended Complaint alleges "Defendants have exploited their market power in this highly concentrated market by conspiring to limit the supply, and fix the prices, of beef sold to Plaintiffs in the U.S. wholesale market." Filing No. 34-8, at CM/ECF pp. 5-6, ¶ 2). See also, Filing No. 34-8, at CM/ECF pp. 48-56, ¶¶ 138-159). The discovery described in Request No. 5, which seeks documents analyzing the supply of cattle available for slaughter in the United States and how the impact on fed cattle and/or beef prices, is relevant.

As to Request No. 8, Plaintiffs' complaint alleges Defendants constrained "their weekly kill volume and decline[d] to increase production of beef to meet rising demand, thereby artificially inflating the price of beef." Filing No. 34-8, at CM/ECF p. 56, ¶161). Plaintiffs also allege Defendants imposed an anti-competitive bid process which prohibits producers from accepting multiple bids, grants a right of first refusal to any packer who places a bid, and strictly requires producers to adhere to this system under threat of boycott or retaliation. Filing No. 34-8, at CM/ECF pp. 64-65, ¶181-82). The discovery described in Request No. 8, which requests documents discussing Defendants' fed cattle procurement practices, slaughter levels, beef production, beef sales, and impact on cattle and beef prices, is relevant.

Nebraska Beef claims any relevance of the documents sought in Request Nos. 3, 4, and 5 is not proportional to the needs of Plaintiffs' case and these requests are unduly burdensome. Nebraska Beef argues, "The elements of the conspiracy alleged by Plaintiffs have a narrow focus: the actions of the Big Four, and the effect on the marketplace. Nebraska Beef's internal communications

would not tend to prove any of those elements. (Filing No. 34, at CM/ECF p. 26-27). But as the ninth largest producer of slaughtered beef in the United States, Nebraska Beef is part of the marketplace potentially impacted—for better or for worse—by the Defendants' alleged conspiracy.

In response to Request Nos. 3, 4, and 5, Nebraska Beef's consultant states "Based on my knowledge gained from consulting for Nebraska Beef for the past three years and inquiries that I made to various employees, Nebraska Beef does not have any documents or communications responsive" to these requests "other than documents publicly available through AMS." (Filing No. 34-13, at CM/ECF p. 3 ¶ 11-13).[10] Nebraska Beef's consultant explains:

> Nebraska Beef does not have a marketing or analytics department nor do they have any employee whose role is to provide market analysis. Nebraska Beef has never contracted with any entity to provide market analysis. . .. Nebraska Beef relies on the market analysis provided by the Agricultural Marketing Service ("AMS"). AMS provides extensive, publicly available data and analysis of the U.S. Beef and Cattle markets. In the ordinary course of business, Nebraska Beef and its employees receive a wealth of information from AMS, including raw data, newsletters, reports, and other information. For example, Nebraska Beef obtained the Boxed Beef and Fed Cattle Price Spread Investigation Report produced that is publicly available on the AMS website.

(Filing No. 34-13, at CM/ECF p. 2, ¶¶ 8-9).

Nebraska Beef argues the AMS, the USDA's marketing branch, performs analytics that are publicly available," and "any analytics Nebraska Beef possesses would be from that source and are available to the Plaintiffs without

---

[10] Nebraska Beef has provided no evidence specifically addressing Request No. 8.

the need to impose a burden on a vulnerable nonparty." But it has also stated that any response to Request Nos. 4, 5, and 8 would disclose "protected trade secrets, constitute strategic proprietary information, and/or give the receiving party an unfair competitive advantage." (Filing No. 27-1, at CM/ECF pp. 2-4). The inconsistency between these statements is readily apparent.

If the only responsive information Nebraska possesses are the publicly available AMS documents, then what is it withholding as trade secrets or proprietary information, and why is the protective order already in place insufficient to protect Nebraska Beef's interest in confidentiality? Nebraska Beef sells $850 million of beef annually. (Filing No. 11-2, at CM/ECF p. 2). As the court stated in the October 7, 2022,[11] Nebraska Beef's claim that it never independently analyzes and documents the market prices and supply of cattle available for slaughter is highly suspect.

For the reasons previously discussed, the court finds the consultant's statement that Nebraska Beef has no responsive documents (other than publicly available documents) lacks foundation, does not address the entire relevant time frame, and is not a statement by Nebraska Beef, the party subpoenaed to respond. In addition, Nebraska Beef, acting by and through its consultant and counsel, has presented inconsistent responses to the court and Plaintiffs' counsel. The information sought in Request Nos. 3, 4, 5, and 8 is directly tied to the allegations in Plaintiffs' complaint and its relevance cannot reasonably be disputed. Finally, there is no evidentiary showing that Nebraska Beef will be

---

[11] "[W]e're talking about a kill plant, processing plant, total employees of 2300, and I am supposed to believe that they don't have a computer that will say how they're analyzing the market to see whether they're remaining competitive?. . .  If they are able to operate at a profit, they have to be doing some analysis somewhere along the line that answers some of these questions." (Filing No. 32, at CM/ECF p. 11-12).

unduly burdened by responding to the Request Nos. 3, 4, 5, and 8. Nebraska Beef's motion to quash these requests will be denied.

- REQUEST NO. 6: All Documents that You provided to, or relied upon, in responding either orally or in writing to any request from the [a governmental entity], the Commodity Futures Trading Commission and/or the Chicago Mercantile Exchange (collectively the "Regulators") relating to an investigation of violation of federal, state, or international . . . laws [concerning] alleged anticompetitive conduct, and/or manipulation of Fed Cattle and/or Beef prices.

- REQUEST NO. 7: All Documents Relating to Communications between you and any Regulator regarding a Regulatory Investigation.

([Filing No. 1-1 at CM/ECF pp. 12-13]).

Plaintiffs' complaint states the Defendants' price fixing, market manipulation, concerted output restrictions, and other anticompetitive conduct alleged in the complaint is also being investigated by government regulators. ([Filing No. 34-8, at CM/ECF p. 84-86], ¶¶237-247). As Nebraska Beef points out, government regulators have investigated and continue to investigate whether Defendants' alleged conspiratorial conduct violated the Packer and Stockyards Act. ([Filing No. 34-6, at CM/ECF p. 3]).

Plaintiffs asks Nebraska Beef to disclose any documented communications with regulators relating to investigations of anticompetitive conduct, and/or manipulation of Fed Cattle and/or Beef prices, (Request No. 6), and any regulator investigation, (Request No. 7), that occurred during the relevant time period. Request No. 6 is clearly relevant to the allegations in Plaintiff's complaint, but the focus of Plaintiffs' complaint is anticompetitive conduct, and Request No. 7 is not limited to such conduct (or alleged misconduct). The court will therefore

sustain Nebraska Beef's objection to Request No. 7 as overly broad and encompassing irrelevant information.

As to Request No. 6, Nebraska Beef's outside consultant states that "[b]ased on my knowledge gained from consulting for Nebraska Beef for the past three years and inquiries that I made to various employees, Nebraska Beef has never provided any documents or testimony to any government agency relating to any investigation or violation of anticompetitive conduct, and/or manipulation of Fed Cattle and/or Beef prices." (Filing No. 34-13, at CM/ECF p. 3, ¶14). For the reasons previously stated, this response is insufficient. Nebraska Beef, the party subpoenaed, must diligently attempt to find any responsive information, fully explain those efforts to Plaintiffs and the court, and then answer Request No. 6.

Nebraska's motion to quash Request No. 7 is sustained. It's motion to quash Request No. 6 is denied.

- REQUEST NO. 9: Transaction-level data for all of Your purchases of Cattle, including: all Cattle Purchase Data. This Request relates to the period from January 1, 2010 through December 31, 2020. Plaintiffs request this information in the most disaggregated form (meaning at the transactional level, not aggregated by month or quarter) in which it is kept, and You should produce the data in a comma-delimited text file (e.g. , a file with a file extension of .csv or .txt). If You maintain separate or distinct sets of such data for internal purposes, or any other purpose, Plaintiffs' request is for each separate set of data.

(Filing No. 1-1 at CM/ECF pp. 13-14).

In response to Request No. 9, Nebraska Beef argues:

This request is perhaps the most egregious of all in terms of the burden it places on Nebraska Beef, compared to the absolute lack of

need the parties in the Antitrust Litigation have for this data. First, as previously discussed, Nebraska Beef is required to report this information multiple times a day to the USDA. Second, the USDA provides this data to the public. Third, the USDA is legislatively required to keep important parts of this data anonymous for the express purpose of protecting the interests of meat-packers, specifically small packers struggling to compete in a heavily consolidated market.

(Filing No. 34, at CM/ECF p. 30).

Nebraska Beef initially claims that the transactional data is irrelevant to Plaintiffs' claims. As stated in their complaint, Plaintiffs are alleging Defendants manipulated the market by adjusting their Fed Cattle slaughter rate during certain time frames, thereby maintaining a supply/demand balance that kept prices, and Defendants' profit margin, high. Plaintiffs further allege Defendants limited the ability of producers to receive competitive bids for Fed Cattle. By contrast, as Nebraska Beef has repeatedly stated, it uses an entirely different business model, with the slaughter rate determined by plant capacity and public safety and bids based on nurtured client relationships. So, Plaintiffs' claims of market manipulation by Defendants could be refuted if Nebraska Beef's cattle purchase data is consistent with Defendants' at a transactional level, but those claims could be supported if the trends reflected by that data are inconsistent. In other words, comparing Nebraska Beef's transactional data with Defendants' on a granular rather than an aggregate level could serve to either support or refute Plaintiffs' allegation that Defendants artificially manipulated the market.

Nebraska Beef claims Plaintiffs can receive the transactional data requested from public sources, and therefore asking Nebraska Beef to collect it for them is unduly burdensome. The data from publicly available sources as referenced in Plaintiffs' Complaint is published at an aggregate level, not a

transactional level. Nebraska Beef must report transactional data twice daily, but it acknowledges that the USDA will not release transactional data to Plaintiffs. Under 44 U.S.C.A. § 3572(c)(1), "Data or information acquired by an agency under a pledge of confidentiality for exclusively statistical purposes shall not be disclosed by an agency in identifiable form, for any use other than an exclusively statistical purpose, except with the informed consent of the respondent." Nebraska Beef appears to be claiming this legislation shields the transactional data it reports to the USDA from discovery. However, the USDA is legislatively prohibited from disclosing the data to Plaintiffs; Nebraska Beef is not. The statute does not create a privilege allowing Nebraska Beef to withhold its transactional data in response to Plaintiffs' subpoena.

In its brief, Nebraska Beef explains that for each individual Fed Cattle purchase transaction, a cover sheet is filled out by-hand, and

> the form includes information such as: Seller name; Buyer's initials; date; FD.YD; Bank, Pen #, Head Count, type of cattle, weight, and cost. After slaughter and processing, more information is added to this handwritten form, such as: yield percentage; percentage of prime, choice, roll etc.; hot cost and cold cost. The remainder of the packet contains a transportation invoice and a scale ticket. Finally, <u>the information from the cover sheet is inputted into Nebraska Beef's computer system</u> which produces a printed handout for each individual lot of cattle. Nebraska Beef produces approximately 7,000 transaction packets a year.

(Filing No. 34, at CM/ECF p. 30-31) (emphasis added). Nebraska Beef has provided a copy of one such sales packet, with the names of buyers, sellers and feeders redacted. (Filing No. 34-16). Nebraska Beef claims these names must remain confidential because the sellers are Nebraska Beef's customers, and the company will be harmed if its competitors have access to those names.

Nebraska Beef has not explained whether it made any attempt to locate and download the sales packet computer files, and if it did, why they cannot reasonably be produced or the cost and burden of production. It has not explained if, where, or for how long the written sales packets are stored. It has provided no evidence of where the computer files are stored and for how long. These details are important. For example, while it claims Plaintiffs' proposed listing of ESI search terms is "ludicrously overbroad," (Filing No. 34, at CM/ECF p. 27), that protocol is irrelevant if the records are collected and maintained in file folders within a computer, network, or cloud storage. The contents of these folders, along with any software needed to open them, could be downloaded to an external hard drive with no need to run search terms.

While Nebraska Beef argues that producing the documents would harm its company, it does not explain why the protective order already entered is insufficient to protect its interests. In addition, like the files it placed in the record, names could be redacted either by Nebraska Beef, or more likely by Plaintiffs' counsel with an Attorney's Eyes Only order prohibiting further dissemination of the documents until after redaction is complete. And depending on the software used to create the computer files, document-by-document redaction may not be necessary if the data fields naming the buyer, seller, and feeder can be deleted before the data is downloaded, saved, and disclosed.

In other words, there may be ways of disclosing the voluminous documents responsive to Request No. 9 that will sufficiently address Nebraska Beef's confidentiality concerns and not be difficult or burdensome to accomplish. As the nonparty opposing the production, it bears the burden of showing why the request is overly broad and unduly burdensome and that the information "is not reasonably accessible because of undue burden and cost." (Filing No. 27-1, at CM/ECF p. 4). Even if the court assumes, without evidentiary support, that

releasing the buyer, seller, and feeder names will harm Nebraska Beef's interests, by failing to provide any evidentiary explanation of how and for how long the sales packets are retained, Nebraska Beef has eliminated the court's ability to truly assess the burden of production, or production with confidential information redacted.

In summary, Request No. 9 seeks relevant information that is not publicly available. Nebraska Beef has not shown whether and to what extent production will be burdensome, or how disclosure pursuant to the terms of the protective order will adversely affect its ability to compete. The motion to quash Request No. 9 will be denied.

- REQUEST NO. 10: Documents and Communications discussing or analyzing the utilization of Your Cattle slaughter plants, including: a) any proposed, considered, or actual changes in plant utilization or capacity; b) any proposed, considered, or actual decision to buy, expand, close, sell, slow, or idle a plant; and/or c) slaughter and processing costs, including labor, energy, equipment, and all other non-Cattle costs associated with the operation of the plant.

(Filing No. 1-1 at CM/ECF p. 14).

In response to this request, Nebraska Beef's brief includes a full page of factual statements, none of which have evidentiary support of record. (Filing No. 34, at CM/ECF pp. 31-32) As to subpart a) of Request No. 10, the brief states, "Nebraska Beef has not made any changes in plant utilization based on the actions of the Big Four. Thus, any such information is not relevant to prove any element of the Antitrust Litigation." (Filing No. 34, at CM/ECF p. 31). As to subpart b), the brief states "Nebraska Beef has never proposed or considered buying another plant, expanding its existing plant during the relevant time period, selling the plant, or idling the plant." Id. And, as to subpart c), the request for

"slaughter and processing costs, including labor, energy, equipment, and all other non-Cattle costs associated with the operation of the plant," Nebraska Beef's brief states, "none of this information is relevant to proving the elements of the conspiracy alleged in the Antitrust Litigation. Furthermore, this information includes trade secrets, confidential research, development, and commercial information." Id.

As to subpart c), like Nebraska Beef, the court does not understand how Nebraska Beef's overhead costs for operating its business are relevant to the Antitrust Litigation, and Plaintiffs have not explained the relevance. But as to subparts a) and b), Nebraska Beef's response could indicate how the marketplace—including Nebraska Beef—has been impacted by Defendants' alleged conspiratorial conduct; that is, whether the extent of Nebraska Beef's plant utilization and its ability and interest, if any, to grow as a business has been stifled by Defendants' alleged anticompetitive conduct. Nebraska Beef has not shown, or even argued, that responding to subparts a) and b) would be unduly burdensome. And by arguing a response in counsel's briefing, with no supporting evidence, they have not adequately responded either.

Nebraska Beef's motion to quash Request 10, subpart c) will be granted, but as to subparts a) and b), the motion will be denied.

- REQUEST NO. 11 : Any data dictionaries, data crosswalks, or data keys relevant to the requests above. This can include but is not limited to: (a) any files describing the variables or fields used in the structured data produced; (b) any files describing the contents/values of the variables (e.g., all coded values); (c) any files which link ID codes (customer IDs, supplier IDs, SKUs, etc.) with their identification information; and (d) any files which explain or show the linkage of variables between datasets.

(Filing No. 1-1 at CM/ECF p. 14).

Nebraska Beef argues this request asks for a broad array of data that is not relevant to the Antitrust Litigation and providing a response would be unduly burdensome. (Filing No. 34, at CM/ECF pp. 32-33). Nebraska Beef's consultant explains that Nebraska Beef does not have an in-house Information and Technology department or any IT employees. . . . [and] engages three part time IT consultants to support its operations." (Filing No. 34-13, at CM/ECF p. 3). So, to respond to this request, Nebraska Beef would need to hire an expert in electronic discovery to determine if the data requested is in its system. (Filing No. 34, at CM/ECF p. 33). For similar reasons, Nebraska Beef objects the Plaintiffs' proposed ESI protocol for performing an in-depth search for documents responsive to all the subpoena requests.

To prepare its response to the subpoena, Nebraska Beef hired an IT contractor to extract data from its email server for the January 1, 2013, to June 30, 2020 time frame. Twenty gigabytes of data were extracted and saved in a searchable format. (Filing No. 34-14, at CM/ECF p. 1). The contractor ran a search for the partial strings (words) or strings (not to include terms, such as "within /x number of words")[12] in Plaintiffs' proposed ESI protocol (Filing No. 34-12, at CM/ECF pp. 3-6), and prepared a spreadsheet of the results. (Filing No. 34-15). It took the consultant approximately six hours to extract the email data and approximately three hours to run the search. The total bill for the IT assistance was $770.40. (Filing No. 34-14, at CM/ECF p. 2).

The number of "hits" appears substantial, but there is no evidence that any deduplication was performed or attempted. Without that step, the court does not

---

[12] The IT consultant states he lacks the expertise to perform this type of search.

know whether the search produced an unreasonable number of documents. Moreover, while Nebraska Beef claims the proposed ESI search protocol is unreasonable, it made no attempt to confer with Plaintiffs to narrow the scope. The court will not strike the only ESI protocol currently proposed when Nebraska Beef has contributed nothing to the process.

3) Cost Shifting

Nebraska Beef asks this court to require Plaintiffs to pay for all costs incurred to comply with the subpoena, including any costs to search for ESI. But as of right now, Nebraska Beef has not explained how it uses technology, the extent of devices, computers, or cloud storage where responsive information may be located, or the formats of that data. It has not identified, by name, the likely custodians of the information sought by Plaintiffs' subpoena. It has not explained whether those custodians use stand-alone computers or store information on a local network or in cloud storage. It has, quite frankly, done nothing to assist this court in understanding the burden and cost it will incur when performing a search for digital information responsive to Plaintiffs' subpoena.

Nebraska Beef must have a dialogue with Plaintiffs regarding a search for ESI. Until that occurs, in earnest, the court cannot assess the likely costs of Plaintiffs' proposed ESI search, whether those costs are unduly burdensome and proportional to the needs of the case, and whether Plaintiffs should pay all or part of the costs.[13]

CONCLUSION

---

[13] The court notes that ESI discovery requires cooperation, and whether characterized as a party or a nonparty, those who do not cooperate in the ESI discovery process will likely not avoid all or even part of its associated costs.

Plaintiffs argue, "If Nebraska Beef had focused on complying rather than fighting Plaintiffs' Subpoena, this matter would have incurred less expense to the parties and could have been resolved without burdening the Court." ([Filing No. 38, at CM/ECF p. 8](#)). I agree.

Accordingly,

IT IS ORDERED:

1)   Nebraska Beef's motion to withdraw the motion to quash, ([Filing No. 18](#)), is denied.

2)   Antitrust Litigation Plaintiffs' motion to transfer, ([Filing No. 10](#)), is denied.

3)   Nebraska Beef's motion to quash, ([Filing No. 1](#)), is granted in part and denied in part as follows:

   a.  As to Request No. 7 and Request No. 10(c), the motion is granted.

   b.  As to Request No. 1, the motion is denied as moot because Nebraska Beef has sufficiently responded.

   c.  As to Requests 2, 3, 4, 5, 6, 7, 8, 9, 10 (a) and 10(b), the motion is denied.

   d.  As to Request 11 and the request to set aside Plaintiffs' proposed ESI protocol, the motion is denied without prejudice to reasserting after Nebraska Beef engages in good faith discussions with Plaintiffs' counsel, and the parties present to the court a thorough and candid assessment of the proportionality of the requested discovery, with supporting evidence.

e. As to the request for cost-shifting, the motion is denied without prejudice.

4) Nebraska Beef shall <u>immediately</u> engage in good faith discussions with Plaintiffs' counsel regarding the ESI protocol and the documents it can produce, if any, without performing ESI discovery. Any failure or breakdown in those discussions shall <u>immediately</u> be reported to the undersigned magistrate judge and an <u>evidentiary</u> hearing will be promptly scheduled.

5) Nebraska Beef's full and complete response to Requests 2, 3, 4, 5, 6, 7, 8, 9, 10 (a) and 10(b) shall be served on or before January 17, 2023. No continuances will be granted absent a <u>substantial</u> showing of good cause.

6) If as of January 25, 2023, the parties are still disputing the scope of Nebraska Beef's obligation to respond to the subpoena, or if documents have not yet been disclosed in accordance with the parties' agreement by that date, an evidentiary hearing as to the reason for noncompliance and any proportionality factors will be held before the undersigned magistrate judge on February 8, 2023, at 2:00 p.m. in the Special Proceedings Courtroom of the United States Courthouse, Omaha, Nebraska, with hearing briefs due on or before February 1, 2023. Plaintiffs' counsel, counsel for Nebraska Beef, a Nebraska Beef representative, and any necessary witnesses shall be present at the hearing.

Dated this 15th day of December, 2022.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge